**Bongo v. Austin**

*Brett J. Riegel*, for plaintiff.

*Patrick J. Best* and *Joshua B. Goldberg*, for defendants.

WILLIAMSON, *J.*, August 6, 2013—This matter comes before the court following a full evidentiary hearing over two (2) days regarding father's request to have primary physical custody of Nicholas Bongo, age 10, and shared legal custody and periods of unsupervised contact with Mason Bongo, age 9. Richard Bongo, is the father of Nicholas and Mason Bongo ("minor children"). Sarah Austin is the mother of the minor children. Richard and Claudette Talley are the step-grandfather and maternal grandmother of the minor children. Jesse and Ann Medina are the great-uncle and maternal great aunt of the minor children. Both children have special needs to be discussed further in this opinion.

The minor children originally lived with mother and father for a brief period of time in New Jersey until they separated in 2004. Mason and Nick then lived with Mrs. Talley ("grandmother") and her husband for two (2) years in their house in New Jersey before going to live with father for three (3) months. The minor children then lived with mother from September 2006 — September 2009, the latter portion of which was in Pennsylvania where a custody action was started by father. Mason then went back to live with grandmother in New Jersey and Nick went to live with Ms. Medina ("great aunt") and her husband in Texas. They both remain in those placements today. Mason Bongo has severe special needs. He is diagnosed as having Attention Deficit Hyperactivity Disorder and Asperger's Syndrome, which is a form of autism. He currently attends the Jefferson Township (New Jersey) School System in Lake Hopatcong, New Jersey. His

teacher, Yolanda Sanchez, testified Mason was aggressive and threw objects, chairs and other items at his teacher and others when she started working with him. Mason also has had issues with running away if not fully supervised. He will wander off. Mason has encopresis and often needs to change clothes at school, which he usually refuses to do. Mason has, by all accounts, shown significant progress from where he was, but he needs time and services to adapt to changes. Structure is very important. Mason just completed the third grade.

Dara Duryea, a licensed clinical social worker, has been seeing Mason since 2006. She is also working on reunification efforts between Mason and father. Ms. Duryea testified Mason wants what he wants and he will melt to the floor or go to a corner of the room and cry until he can be calmed down. Although Mason is less aggressive now, and can be calmed down at times, he will always present with autism which creates a struggle in his daily life.

According to Mrs. Talley, Mason knows her as if she were his parent. She and her husband have cared for Mason most of his life. Mrs. Talley is the mother of Sara Austin. Mason, Mason's half sister, Jessica (age 12), and another adult daughter of Mrs. Talley live with Mr. and Mrs. Talley in Jefferson Township, New Jersey. Mason's mother, Sarah Austin, comes to visit Mason at her mother's house. Mason's father, Richard Bongo, who also resides in Jefferson Township, New Jersey, sees Mason in a supervised setting with Dara Duryea, Mason's counselor, and at Mrs. Talley's house. By order of court, Mr. and Mrs. Talley currently have sole legal custody of Mason and primary physical custody subject to mother's periods of

partial custody at least three (3) times per month as agreed with the Talleys. Father's periods of physical custody are in counseling sessions with Dara Duryea, LCSW, and at times and locations as determined by the Talleys. Mason was not brought to court due to his special needs. Mrs. Talley was present, but Mr. Talley was not.

Nicholas currently lives with his maternal great-aunt and uncle (Mr. and Mrs. Medina) in Beaumont, Texas. Nicholas was present in court and an in camera hearing was held on the record with him. Nicholas is entering the 5th grade. He loves his great-aunt and uncle. Nicholas and Mason's half brother Kaleb (age 7) also lives with the Medinas. Nicholas likes his brother Mason best and he misses seeing his mother and father. While Nicholas stated he would like to see about living with his mother in a year or so, he also said he does not want to leave Texas. He stated he has friends there and would miss them.

Nicholas is also diagnosed with special needs; however, his special needs are much less pronounced than Mason. Nicholas was recently dismissed from special education through an I.E.P. placement. He has no learning disabilities at this time. He had behavioral issues and was on medications when he went to live with the Medinas. He was also diagnosed with Pediatric Bipolar Disorder.

Nicholas presented to the court as a happy and well adjusted child. He was not good with dates, times, or numbers, and his perception of things appeared somewhat impaired, even for a ten year old. For example, he described having twenty (20) or so friends that he liked to play with, but could only name a few. Mrs. Medina also confirmed he has a few friends next door he plays with regularly and

one boy that only comes to live in the neighborhood on weekends. Father described Nicholas' friends in Texas as one friend, one cousin, and six (6) kids in a family that lives next door to the Medinas. Mrs. Medina also confirmed some developmental issues when she described an incident where Nicholas saw a friend standing outside of a house, and he was convinced the friend lived there even when told no, that the friend was just visiting. Mrs. Medina also described Nicholas as very destructive with little regard for things. He does not realize proper actions to avoid causing damage to items. Nicholas loves sports, especially football and the Dallas Cowboys.

The father of Nicholas and Mason is Richard Bongo, Jr., age 28. He resides with his girlfriend, Jessica Gravino, age 29, in Jefferson Township, New Jersey. Father has no other children. Father and Ms. Gravino have known each other for three (3) years and have lived together for about two and one-half years. Ms. Gravino has spent time with Nicholas when he visits with father. Nicholas describes her and his father as "fun and nice." Ms. Gravino works as a billing supervisor Monday-Friday 8:30 a.m. — 5:30 p.m. She left the family restaurant business where she worked seven (7) days per week with long hours because it was not conducive to having a family. Ms. Gravino reported she has a great relationship with the father. She stated she has never experienced any domestic violence and that when they have disagreements, the father will generally walk away to cool down. She has seen Nicholas about a half dozen times, including Thanksgiving and Christmas in 2012, and two times the father went to Texas to see Nicholas since Christmas 2012. Ms. Gravino would welcome Nicholas living with her and the father and has

looked into coordinating a transition. She has also looked into available activities and summer camp for Nicholas.

Richard Bongo works for New Jersey Transit with whom he has been employed since 2004. He is a unionized car inspector (train cars) with some seniority. He currently works Monday, Tuesday, Wednesday from 7:00 p.m. — 3:00 a.m. and Saturday and Sunday from 4:00 p.m. — midnight. These hours afford him the opportunity to do more overtime. He believes he would be able to switch to day hours or to having off on weekends if Nicholas came to live with him. Father works twenty minutes from his home.

Father and Ms. Gravino currently reside in a two bedroom house that they rent. They are considering purchasing a home in the same general area. Mr. Bongo and Ms. Gravino have various family members who live within a short distance from them. Father currently resides in the same school district where Mason attends school.

Father and mother began a relationship in 2002 when father was 17 and mother was 18. Mother already had a child at that time, named Jessica (now age 12). The parties never married. They had Nicholas in 2003 and Mason in 2004. The relationship was explosive as described by all parties. Mr. Bongo admits he was immature, volatile and abusive, and that mother behaved similarly. Father also described mother as having possible mental health issues and was abusive of prescription drugs. Father was an angry, jealous person with an explosive temper, as reported to Bruce Snyder, who performed a psychological evaluation for these proceedings. Father admits the concerns of the Medinas and Talleys were justified based on how he treated

the mother. He reports verbal and psychological abuse of the mother, and that the children witnessed unhealthy behavior by both parents. Father states he has changed, both through maturity and counseling. Father denies any other abuse, other than in his relationship with the mother.

Father and mother had an on and off relationship that was terminated shortly after Nicholas' birth. They reunited for a brief period of time, just long enough for the birth of Mason. They split up for good after that. The children initially lived with mother and the Talleys, but then went to live with father for three (3) months. The placement with father ended when the New Jersey Division of Youth and Family Services (DYFS) became involved after allegations father hit Nicholas with a bat. A New Jersey court found father to be neglectful and both children went to live with the maternal grandmother. Mother was not available to take the children at that time.

The children started to live with mother again in September 2006. At some point in 2008, mother took the children to live in Monroe County, Pennsylvania to live and father claimed she did not inform him of this. Father did not see the children during that time period. In September 2009, mother was no longer able to care for the children and she requested a guardianship for the children. The Monroe County Orphans' Court ordered the Medinas as guardians of Nicholas and the Talleys as guardians for Mason. The Medinas took Nicholas to live with them in Texas and the Talleys took Mason to live with them in New Jersey. Father eventually learned of the guardianship after it was established, and filed for custody in Monroe County, Pennsylvania within a month of the children leaving the jurisdiction in 2009. This matter has been in

Monroe County custody court ever since. Father stated he had no knowledge of the children being in Pennsylvania until the guardianship was entered.

Father has complied with all court ordered requirements including anger management, psychological evaluations, home studies, counseling, parent training specific to children with special needs and autism, and parental reunification efforts. Father has attended 26 sessions with Randy Bressler, Psy.D., a clinical psychologist, since March 16, 2012. Ms. Gravino has attended 8-10 of those sessions. The sessions dealt with multiple issues to prepare father to deal with Mason's special needs, and parenting of his children. Father continues to meet with Dr. Bressler.

Father has also attended multiple sessions with Ms. Dana Duryea, Licensed Clinical Social Worker. Ms. Duryea started counseling sessions with Mason in 2006 after the involvement of DYFS and the New Jersey Court. Ms. Duryea diagnosed Mason as autistic with ADHD. Autism is a neurological disorder that effects the processing ability, perceptions and social skills. It is different in every child. ADHD causes little or no impulse control, susceptibility to distraction and difficulty remaining on task. Ms. Duryea has seen improvement with Mason, but agrees he needs consistency and does not adapt well to change. Mason needs to be supervised at all times, or he may wander away. While Mason's behavior has settled down, he often needs re-direction and other techniques to keep him calm. Father's sessions with Ms. Duryea and Mason are designed to acclimate Mason with his father, and to help father learn how to cope with Mason's special needs. Father has been participating in these sessions since 2011, and he usually attends at least one (1) time per month.

Father had a full psychological evaluation with Bruce E. Snyder, M.S., Licensed Psychologist, of Family Treatment Associates in Stroudsburg, Pennsylvania. Mr. Snyder issued a report dated December 2, 2011 detailing the findings of his evaluation. Mother did not have an evaluation done, and maternal grandparents and great-aunt and uncle were not required to have evaluations. Father was open and candid with Mr. Snyder regarding his past behavior. There were no psychological disorders noted. Mr. Snyder found father to be concerned for his children in a genuine manner.

The mother of the minor children is Sarah Austin, age 29. Mother is not seeking custody of the minor children. In addition to Austin and Mason, mother has four other children. She has a daughter (Jessica), age 12, who lives with Mrs. Talley and her husband, and a son (Kaleb), age 7, who lives with Mr. and Mrs. Medina. There was no explanation of why these two children do not live with mother, nor when they began to live with the Medinas and the Talleys. The father of these two children is mother's ex-husband, with whom she had a relationship both before and after her relationship with Mr. Bongo. Mother also has two (2) girls, ages 3 and one (1) who live with her. There was no other information at the hearing regarding the two (2) children currently living with mother. Mother did not give a full work history or any further insights on her personal life. Father reports mother has prior psychiatric and drug issues. Mother did not address these issues at hearing. Most of her testimony was about her abusive relationship with father and how difficult she found it was to take care of Nicholas and Mason. Mother described her time in caring for the children as being overwhelmed and

that father has no idea what it is like to try and take care of these children. Mother believes it is impossible for father to change.

Mother stated that her mother is doing a wonderful job raising Mason and that is where he belongs. She said she sees the children whenever she wants. However, she has not been to Texas since June 2009. There was no testimony as to how often mother has seen Nicholas when he comes to New Jersey to visit.

Mother has a very strong opinion of father's request for physical custody of Nicholas, and unsupervised visits and shared legal custody of Mason. Her opinion can best be summed up as: never, under any circumstances. Mother said father "does not have it in him" to care for the children. When asked if father should be afforded a chance, mother responded that maybe father should have taken better efforts in the past. Mother believes father has no idea of what is involved in parenting the children. She said father should never have custody of Nicholas, and he is not ready for visits with Mason. She believed that one (1) year of counseling was not enough. Mother stated that father's motives are "sick and sadistic," and that he wants to "rip" the children away from people who love them. Tellingly, mother said the current placement of the children is what she wanted all along for them.

Mother was present for the first day of the hearing when she testified, but she did not attend the second day of the hearing. Mother presented no evidence of her current interactions or care for the children.

Mr. and Mrs. Medina are the great uncle and aunt of Nicholas. Mrs. Medina is Mrs. Talley's sister and maternal

aunt to the mother, Sarah Austin. The Medinas reside in Texas. Mr. Medina testified by telephone from Texas. Mrs. Medina was present for both days of hearings. Mr. Medina described Nick as having his ups and downs. Mr. Bongo reported that Mr. Medina believes he (Mr. Bongo) is ready to care for Nick and Nick should go to his physical custody. When asked in court if Mr. Bongo was ready to care for Nick, Mr. Medina's answer was not as clear. Mr. Medina, clearly conflicted in his feelings, reported he would never keep Nick from his father, but that Nick needs some special attention. He believes father was more of an observer of Nick growing up, and not as helpful as he could have been. Mr. Medina clearly loves Nick, and stated he would miss him like a son if he left. However, Mr. Medina's testimony showed an understanding of Mr. Bongo's parental rights as a father.

Mrs. Medina was more certain. While she showed good insight in recognizing father's efforts and need for a relationship with Nick, she does not believe that he is ready to provide the stable environment in which Nick could thrive. Mrs. Medina candidly stated she never expected father to want or try to regain custody of Nick. She was surprised by his efforts over the last thirty (30) months and has seen positive changes in father. She is the only member of mother's family that recognized father's efforts and acknowledged a change.

However, Mrs. Medina still has concerns with father having custody on a full time basis. She believes father is too competitive. She sees the relationship between father and Nick as only being based on controlled situations. Mrs. Medina says Nick is very destructive with things. She thinks Nick should stay with her. She also does not believe

her niece (mother) should get Nick back either, because of Nick's need for stability. Mrs. Medina thinks father is not yet patient enough or receptive to other people's ideas. Finally, Mrs. Medina believes Nick would be negatively impacted by not living with his half-brother Kaleb.

Mrs. Medina stated Nick can grow into a relationship with father, but a change need not happen now at "Nick's expense." She feels she has been very accommodating in the visits for father with Nick. She would like the custody arrangements to continue as it has been under the current order.

Claudette Austin-Talley is the maternal grandmother of the minor children. She resides with her husband (Sarah Austin's step-father), Mason, her granddaughter Jessica, age 12, and another adult daughter. Mason has lived with her since an order for guardianship was entered in this matter. Mason also resided with her the first two years of his life. She confirmed Mason's special needs. She has also seen some improvements, including behavioral changes at home and in school. However, Mason remains aggressive, susceptible to outbursts due to change or not getting his way, periods of incontinence, and an affinity for wandering away.

Mrs. Talley reported father has been attending sessions with Mason and Ms. Duryea, and that he has also had visits with Mason at her house in the last 6-8 months. She stated father does not ask about Mason's I.E.P. or activities, but father says neither she nor the mother provide information.

Mrs. Talley does not hide her dislike of father. She also does not believe he should share legal custody with her or have unsupervised visits.

Mrs. Talley feels father does not recognize the extent of Mason's disabilities. She thinks to allow unsupervised visits would upset the structure that Mason needs. Mrs. Talley stated that Mason would be more of a problem if father shared legal custody. She thinks Mason only recognizes father as someone to play with, rather than as a father and son parenting relationship. Mrs. Talley believes father will not listen to instruction to assist in parenting Mason, and in particular, father will not work with women, or her, in doing what is best for Mason. Mrs. Talley agrees she and Father have a "history" which suggests to the court a rather strained relationship due to past events.

Father requests primary physical custody of Nicholas, and shared legal custody with periods of short unsupervised visits with Mason. Father hopes this may eventually lead to more time with Mason. In determining custody of the minor children, the court must consider the various factors set forth by statute. These factors are listed under 23 Pa. C.S.A. 5328 as follows:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's

education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or

member of a party's household.

(16) Any other relevant factor.

23 Pa. C.S.A. §5328 (a).

In review of the first factor in this case, we find that father is most likely to encourage and permit frequent and continuing contact. Father seeks physical custody of Nicholas, but only shared legal custody and periods of unsupervised visits of Mason at this time. mother has made her feelings crystal clear. She emphatically stated that father has some type of evil motive and he should not have any increased time with their children. Mother does not ask for any time for herself, and sees Mason "whenever she wants."

However, mother and Mrs. Talley make little effort to involve father with Mason. Both claim father never asks about events and activities of Mason and point to father's failure to attend Mason's Special Olympics/Challenger events. Mrs. Talley stated it was a sign of father's refusal to accept Mason's disabilities. Father says he was never told about events, nor invited, and often not given full information. We find Mrs. Talley has accommodated the base minimum of the court order, requiring visits for father at Dana Duryea's counseling sessions and at times and places determined at the sole discretion of the Talleys. These visits allowed by Mrs. Talley are at her house and have not occurred often. There is not a lot of encouragement by the Talleys. There is none by mother.

This court recognizes there is a spoken and unspoken history regarding mother, Mrs. Talley and father, but we find that tension, and an almost outward hostility was

exhibited by mother and Mrs. Talley, both in testimony and by their demeanor in court. Therefore, we believe father would be more encouraging of frequent and continuing contact.

To the credit of the Medinas, they have been more accommodating considering they also care for another child of mother, and they live a long distance away from father. It appeared father has done more and gone out of his way to spend time with Nicholas whereas mother has not. There was little testimony of Nicholas' continued relationship with Mason; however, it appears father would encourage that connection if Nicholas lived with him. The Medinas have welcomed father and father's girlfriend at visits in Texas, and allowed visits with father in New Jersey. While we find the Medinas would continue this, we also recognize the Medinas' reluctance to assess when they believe father would be ready to parent Nicholas. It is doubtful, without a court order, that the Medinas would relinquish custody to father, regardless of the circumstances. We believe this will impact their ability to encourage more frequent contact of Nick with father.

There was past abuse committed by father on mother. The relationship may also have been mutually abusive. Furthermore, there was an allegation that father hit Nick with a bat while in his care in 2006, and a New Jersey Court found that father was neglectful of the children. The children then resided with maternal grandparents and then with mother. DYFS was also involved previously due to care by father and mother. Father denies any abuse of the children. He admitted abuse of mother. Father also alleged that the abusive relationship was caused in part by mother's mental health issues and drug use. Father's

behavior cannot be condoned for any reason, but we note that father was forthcoming in court, in the psychological evaluation, to his counselor and to Dana Duryea regarding his abuse of mother. He also acknowledged his continued counseling for parenting skills, completion of anger management, and his current stable relationship with his girlfriend, Ms. Gravino. We find father's testimony credible.

Father is requesting shared legal custody and unsupervised visits with Mason. There were no reports of father having anger issues, or other indicators or precursors of abusive behavior in his visits with Mason. While Mason would not be able to protect himself if abused, short periods of physical custody would provide greater safety for him. However, we find Mrs. Talley can better provide overall physical safety at this time on a full-time basis.

Father is requesting physical custody of Nicholas. There have been no reports of problems, anger issues, or any inappropriate actions when father has exercised periods of partial physical custody of Nick. We find that father has made changes and taken great strides since the time of his self-reported abuse of mother, such that Nick would be safe at this time when he is with father.

Mother and father both performed parental duties for only a short period of time. Mother performed more on a full-time basis, notably after the parties first separated, and again from 2006-2009. However, mother is not seeking physical custody. She seems quite content with the current physical custody, and would likely prefer even less time for father. While the guardianship of each child that

started in 2009 appears to have been necessary, mother was adamant in her belief that it was best for the children, both then and now, and what she always wanted.

From 2009-present, the Talleys have provided all parental care of Mason and the Medinas have provided all parental care of Nick. Father has tried to regain a role in his children's lives since learning of his children being placed pursuant to the guardianship. Father immediately filed for custody to re-establish a connection with his children and has abided by court orders gradually allowing for more time with his children over the last three and one-half years. Father has completed all that has been required by the Pennsylvania custody orders, and he testified that he abided by and completed requirements of the New Jersey courts. He has exercised periods of partial custody with Nick, and is ready to perform full-time parental duties for Nick. There is no proposal to change the primary custody of Mason.

There is a definite need for stability and continuity in Mason's life, both at home, and in school. This was adequately testified to at hearing. The Talleys provide this and father is not seeking to change primary custody. The Talleys, and to some extend Dana Duryea, LCSW, believe any change in routine, including unsupervised visits with father, will severely effect Mason. Ms. Duryea described a possible outcome of Mason regressing to infantile behavior. While the court did not receive any other reports or testimony concerning the effect on Mason if visits were increased or changed in any way, the view of Ms. Duryea seems extreme and hard to believe. Mason has been visiting with his father for some time, both at sessions with Ms. Duryea, and at Mrs. Talley's home. There have

been no documented outbursts, uncontrolled behavior, or regression by Mason as a result of those visits. It makes sense that increased visits, with Father be started slowly and in controlled situations, such as at Mason's activities, and in the community with the Talleys. These could lead to more visits that are eventually unsupervised. This would not appear to upset the stability and continuity that Mason requires.

Nicholas has done well in his placement with the Medinas. Although less emphasis was placed on his need for stability and continuity in his education and family life, he has improved greatly. The Medinas have provided an excellent home and care of Nicholas. He was recently discharged from an I.E.P. with no current learning disabilities. Nick and the Medinas noted their close relationship with each other. Nick has some friends and appears to enjoy Texas.

Father lives in the same school district that Mason attends. Mother, maternal grandmother and step-grandfather, also live near father. Nick's half-sister Jessica also lives with the Talleys. Father appears to recognize Nick's needs for stability and continuity, although they are not near the level of Mason's needs. We believe father can provide for those needs.

The availability of extended family and the child's sibling relationships have no impact on father's request to share legal custody of Mason and for unsupervised periods of partial custody of Mason. Mason currently resides near father and he would remain in the primary care of the Talleys, even if father's request is granted. Mason has a relationship with his half-sister Jessica, who resides with him.

Nicholas resides with his maternal aunt and her husband in Texas. His seven (7) year old half-brother, Kaleb, lives there too. Both Nick and the Medinas testified to Nick's close relationship with Kaleb, which is to be expected as that is the only other sibling that lives with him. Father, mother, maternal grandparents, father's family and Nick's brother Mason, half-sister Jessica, and his two younger half-sisters, all reside near each other in New Jersey. Nick does not appear to be particularly close with any of his New Jersey relatives or siblings, although it is likely due to the distance between them. Nick lived with Mason until the guardianships were established in 2009, but their time together is best described as chaotic.

Mason was not interviewed by this court due to his special needs, age, and relative maturity level. Therefore, his preference is not considered. Nicholas was present in court and he testified in camera in a manner as expected by a ten (10) year old. He enjoys where he lives, likes his younger brother, and has friends with whom he plays. Nick does not want to leave his friends because he would miss them. Nick wants to see his father and mother more often. He describes his time with father and Ms. Gravino as nice and fun. Nick said he likes his brother Mason best.

Nick is going into 5th grade and he seems well adjusted and happy. However, his sense of reality and perception seems somewhat off, which may be related to his maturity level or special needs. He struggled with dates, times and numbers. He said he does not want to leave Texas, but would see about living with his mother in a year or so. He has no knowledge of mother's struggles caring for him and Mason. Nick's age, maturity level, and judgment are such that his preference is given little to no weight.

There was no testimony that one parent or party has tried to turn the children against another parent or party. Although a past history has caused tension and a level of animosity toward father by Mrs. Talley, mother, and to a lesser extent, Mrs. Medina. There was no evidence of attempts to alienate father from the children and this is a non-factor.

The Medinas and father both appear able to provide a loving, stable, consistent and nurturing relationship with Nicholas that would be adequate to his emotional needs. They are both likely to attend to the daily physical, emotional, developmental, educational and special needs of the child. The Medinas have been providing such a relationship since they obtained guardianship of Nicholas in 2009. They clearly continue to meet the needs of Nicholas as set forth in determining custody. Father has demonstrated that he can also provide such a relationship and attend to Nick's needs. Father has completed all required counseling and continues to seek parenting advice. Father's visits with Nicholas have gone well and he is gradually building a stronger relationship with Nicholas. Father appears to now have a better understanding of the needs of Nick and the importance of a stable, consistent and nurturing home for him. Father is now ready to provide what is necessary.

Nicholas is certainly bonded with the Medinas, and his brother Kaleb, but he also evidenced strong feelings for his brother Mason and his father. While Nick has some type of special needs, father can provide for this in his current residence and in the school district Mason attends. Services can be put in place for Nick, both in school arid out of school, to address any needs he may have. Nick

has adapted well in school, he no longer has an I.E.P., and he appears able to make friends easily. There was no evidence father cannot provide for Nick's daily needs. We find the Medinas and father are both able to provide these factors considered for custody.

We note mother does not seek a change in custody of Nicholas, and therefore, we will not address her abilities in this regard. There was also no testimony offered as to her interactions with Nick, how often she sees him, or her ability to provide this factor. She made her feelings clear when she stated she wants Nick to stay with the Medinas.

Father is not seeking primary physical custody of Mason. We find the Talleys are able to maintain a loving, stable, consistent and nurturing relationship with Mason. At this time, we also find that the Talleys are more likely to maintain this relationship which is necessary for Mason's emotional needs. This is due to the time the Talleys have already had custody of Mason, and in light of his special needs. We also find the Talleys are currently more likely to attend to the daily physical, emotional, developmental, educational and special needs of Mason. These factors favor the Talleys, although we recognize father is only requesting shared legal custody and increased periods of visitation or unsupervised periods of custody. Mother has stated she sees Mason whenever she wants, which the court deems likely since Mason lives with her mother, and in close proximity. Mother does not seek a change in custody; and therefore, we will not review these factors in full as to her.

Currently, the Medinas are the only ones who live far from father, mother, maternal grandparents, and Nick's

siblings (with the exception of Kaleb who lives with the Medinas). Father, mother, maternal grandparents, Mason, and Nick's three other siblings all live relatively close to each other in New Jersey. Father and the maternal grandparents even live in the same school district. The parties have been arranging for visits between father and Nick in Texas and New Jersey a few times each year. There was no testimony of Nick regularly visiting with his mother, maternal grandparents, or three other siblings living in New Jersey, except for two planned periods this summer. Although there is a long distance between the Medinas and father, it is the same long distance to all of the rest of Nick's family (except Kaleb). While a change in custody will effect the time the Medinas and Kaleb have with Nick, father and the rest of the family can easily share time with Nick due to the short distance between them. Likewise, summer and holiday visits can take place as they have in the past.

Mason lives with his maternal grandparents in close proximity to father and in the same school district. This distance would have no effect, upon father's requests for shared legal custody, and increased visits and unsupervised periods of physical custody.

The Medinas, Talleys and father all appear capable of providing for care of the child or able to arrange appropriate child-care. The testimony in this regard was minimal. father stated he can change his hours/days of work. Father's girlfriend stated she took a less time-intensive job in anticipation of family responsibilities. Father would need to arrange child care for Nick when he is out of school. Father and his girlfriend have looked into summer camps and other child-care arrangements.

Father would not need child care for his proposed periods of visitation or unsupervised periods of custody of Mason.

There was no testimony from the Medinas or Mrs. Talley as to child-care arrangements. However, it appears they have been able to manage adequately in the past three and one-half (3 1/2) years as there was no testimony to the contrary. Therefore, this is not an issue in this case.

There is an obvious conflict between the parties. Mother acknowledged that she does not want father to have custody of the children under any circumstances. She testified to prior abusive treatment by father. Mother's testimony clearly showed she is not willing to cooperate with father in any manner. She believes father "does not have it in him" to care for the children. Mother said she would never want the children with father.

Mother previously left New Jersey with the children and lived in Pennsylvania for several years prior to the guardianship filings. Mother states she told father of the move to Pennsylvania, and that father filed an action in New Jersey opposing mother's relocation, but it was denied. Mother did not produce this filing or court order at time of hearing. Based upon mother's demeanor in court, her testimony, and father's attempts to see his children and establish periods of custody since learning of the Pennsylvania guardianship, leads this court to believe mother attempted to keep the children from father. At the very least, she did not willingly involve father in the lives of the children.

We find the prior alleged abuse by father on mother, and the DYFS investigation and New Jersey court order regarding removal of the children from father's care in 2006

are not reasons for discounting mother's behavior. Mother gave no testimony of why she moved to Pennsylvania. Prior to her move, mother and children resided with or near maternal grandparents. There was a court order limiting father's contact, and father was required to attend counseling. Father and mother had been separated for several years. Father was also able to see the children prior to mother's move to Pennsylvania. Therefore, we cannot say mother's move to Pennsylvania, or unwillingness to cooperate with periods of custody, was based solely on an effort to protect the children from father.

Mrs. Talley appears to tolerate father, and his court ordered visits with Mason. She has allowed limited visits at her home. There was only one reported community visit, involving the Bass Shoe Store. At best, Mrs. Talley provides the minimum of information and time to father regarding Mason. We find Mrs. Talley has done little to encourage father's periods of custody, or in providing more information to father. Mrs. Talley admitted to having "a history" with father, which we take to mean his treatment in the past of her daughter, and Mrs. Talley having various periods of custody of Mason. Father even admitted Mrs. Talley was justified in her feelings. He also described the relationship in his psychological evaluation as being like "oil and water." We find father is more willing to look past the prior conflicts in an attempt to spend quality time with his children. Father appears appreciative of Mrs. Talley and her husband for caring for Mason (and of Mr. and Mrs. Medina for caring for Nick). Father has attended counseling sessions with Ms. Duryea and Mason as recommended, and he appears to follow instruction there. Father has attended visits that Mrs. Talley has allowed

in her home. Recognizing the tension present in court between the parties, and likely present at these visits, we find father truly wants to spend time with his son and establish a father and son relationship, despite the discord.

The situation is clearly not ideal. Mrs. Talley maintains control of all visits. This may be necessary to maintain Mason's sense of stability and normalcy as much as possible. Mrs. Talley cites father's unwillingness or inability to change Mason's clothes during a visit following an incontinent episode. She did not recognize what is a reasonable possibility: that father tried and Mason began to meltdown, so father deferred to the usual occurrence of Mrs. Talley changing Mason's clothes. Whether or not this is how it happened is not the point. Rather, Mrs. Talley, based on prior experience or her own preconceived notions, refused to see it as a possibility. This may also be the case regarding father's claims that he is not included in Mason's events. Father says he is not invited to I.E.P. meetings, school events, or Special Olympics/Challenger events. Mrs. Talley (and mother) stated father was given notice of the events taking place. Mrs. Talley also used the example of father not attending the Special Olympics/ Challenger event as proof father refuses to accept the full extent of Mason's disability and special needs. (This was also a theme of Ms. Duryea). However, father stated he is not always given dates and times, locations, or information prior to the events. He also does not appear to be included in school information or I.E.P. meetings since he does not have legal custody. Considering the past history of the parties, Mrs. Talley's demeanor and testimony at the hearing, as well as mother's, we find father credible in this regard. We believe he would attend events if included or

given specific information reasonably in advance. Father appears more willing to cooperate with the parties than they do with him.

Mr. and Mrs. Medina have been more open and conducive to a relationship between father and Nick. Likewise, father has done the same. Mrs. Medina appears to have more reservations about father and his being ready to care for Nick than does Mr. Medina. However, despite the prior history in this case, and the obvious distance between them, the Medinas have shown a willingness to encourage father's relationship with Nick. We believe they would continue to do so in a positive manner.

There was no reported or confirmed history of alcohol or drug abuse or mental or physical conditions effecting father, the Talleys or the Medinas. Father alleged mother had psychiatric issues and that she had abused prescription drugs. There was no other testimony in this regard. While there may be reasons why mother only has custody of two of her six children, we cannot presume to say that alcohol or drug abuse or mental health issues exist or effect the children in this case. This is a non-factor.

It is relevant to note that father has completed all that was requested of him by the custody courts. Father also reported completing all that was required of him due to the involvement of DYFS and a finding in New Jersey that he was neglectful in 2006. Father has worked toward custody in this court for the last three and one-half (3 1/2) years. First, he gained visitation and then periods of physical custody of Nick; then visitation with Mason. Father has continued counseling with Dr. Bressler, and he has been forthcoming about his past behavior. Father appears

honest in that regard. He understands the concerns of the Medinas and the Talleys based on how he treated Ms. Austin. He presents as someone who has changed, who has genuine love and concern for his children, and who believes it is in his children's best interest to spend more time with him. Father states he understands the extent of Mason's disability, and that he takes steps to do certain things and not do certain things so as not to upset Mason. Father also recognizes Nick has his ups and downs. Father understands his children have different needs. He has gained insight about himself, his children, and their needs.

Mother and Mrs. Talley believe father does not have a full understanding of Mason's needs, or his disability. They believe this impairs father's ability to interact with and parent Mason. Mrs. Medina worries about father being too competitive. She believes he would challenge Nick to perform tasks even when he is not capable to do so. This is not supported by the record as no examples were given. The current concerns of mother, Mrs. Talley and Mrs. Medina appear misplaced.

Ms. Duryea also stated that she believes father does not fully understand Mason's needs. This may be due to father's limited contact with Mason, or the structured office setting of the visits she observes. This is also the role Ms. Duryea should be providing to father to work on his recognition, understanding and coping skills. Ms. Duryea stated father's interactions with Mason at her sessions have improved in the last year. However, she believes Mason sees the sessions as playtime and the communication level is no different. Ms. Duryea pointed out a negative in that father was not successful in talking Mason down from a meltdown at her office, and Mrs. Talley had to do it This

is similar to the clothes changing incident at the Talleys. In both instances, it is reasonable to expect Mason, who by all accounts does not handle change, would react better to Mrs. Talley who deals with him on a regular basis. In short, we question how father will adopt and improve on these skills if never given the opportunity because Mrs. Talley is always there.

In stating father is not ready for unsupervised visits, Ms. Duryea simply said father does not fully understand Mason's needs. There was no further explanation. Ms. Duryea had also testified that any change will scare Mason into infantile behavior and he would have to re-learn proper responses. However, this did not occur when father was re-introduced into Mason's life, nor in the sessions with Ms. Duryea, nor at the supervised visits of father at the Talleys. We believe with the proper direction and counseling sessions, father and Mason could extend visits, meet in the community, and have some type of a father and son relationship, even with Mason's special needs. By this, we do not mean father can change Mason and have what may be considered a normal relationship. Rather, a relationship in which a bond is formed as a father and son, other than simply in a controlled setting. We believe this is something the parties and professionals should be working together to achieve.

We reviewed the reports of Dr. Randy A. Bressler, clinical psychologist. Dr. Bressler has worked with father on recognizing Mason's special needs, his educational needs, and his emotional and behavioral issues. Dr. Bressler also believes that increased visits beyond what occur at Ms. Duryea's office are also needed so as not to undermine father's efforts to bond with Mason. We also note that Ms.

Duryea reported on December 12, 2011 to Bruce Snyder, M.S., who performed the court ordered psychological review of father, that father regularly attended sessions with her and Mason. She reported that although father was friendly and outgoing with Mason, and displayed no angry or hostile behavior, he lacked an understanding of Mason's autistic disorder. She recommended father attend classes geared toward helping parents learn more about the disorder and to cope with it. Father did this in his sessions with Dr. Bressler. In his report of June 18, 2013, Dr. Bressler noted that father gained insight about Mason's special needs, that he has a greater awareness of autism disorder, and developed parenting and coping skills specific to Mason's needs.

Therefore, we find that father should have increased time with Mason, first in supervised settings, and then in the community. As they progress, this court can entertain a request for unsupervised visits. The supervised visits should continue with Ms. Duryea, but we will fashion an order with increased supervised visits at the Talleys, and then in the community.

We do not believe a change in legal custody to shared legal custody between the Talleys and father is best for the child at this time. There is too much conflict between the Talleys and father and we believe there is a strong likelihood that disagreement will arise. Although Mrs. Talley appears less likely to attempt to work together with father, and she harbors obvious animosity due to past matters, shared legal custody or legal custody with father will not work at this time. As the Talleys have been caring for Mason, and there is no change in primary physical custody at this time, it is in Mason's best interest they maintain sole legal custody for now.

However, we recognize father has not been included in I.E.P. meetings, has not received information at times, nor was he consulted and advised of a treatment plan before it begins. Father should be given timely notice, information, and the ability to provide input, even though ultimate decisions shall be made by the Talleys. This will be reflected in this court's order.

As for Nicholas, we also note the following testimony. Nicholas presented as a happy and polite child who spoke openly in camera. Nicholas was brought to court by Mrs. Medina and Mrs. Talley. He had visited with Mrs. Talley and his mother prior to the court hearing. He was going to spend a few days after court with his father. The parties were not able to arrange a visit with father at Father's Day, which was two (2) days before the first day of hearings in this matter. Mrs. Medina stated she has honored some of father's requests for additional periods of custody in the past, but not this Father's Day because of "this circumstance", meaning the court hearing. Mrs. Medina then went on to state that bringing Nick to see his father on Father's Day was against Nick's doctor's advice. However, she did not elaborate.

We view Mrs. Medina as having genuine love and concern for Nicholas. We also note that she was the only family member on mother's side who had something positive to say about father and father's efforts. She and her husband have accommodated and encouraged visits, except for the requested Father's Day. However, Mrs. Medina described father as not having demonstrated patience or being receptive to other's ideas. This mirrors sentiments expressed by her sister, Mrs. Talley. We note that Mrs. Medina did not cite any examples of her personal

interactions with father or instances of father showing a lack of patience or inability to listen to other people's ideas, whether about parenting or anything else.

Mrs. Medina stated Father is too competitive. She did not cite an example. However, father has previously told Nick he cannot just quit a game which Mrs. Medina finds is an appropriate response. She admitted she has seen some good interactions by father.

Mrs. Medina said father is not yet able to provide a stable environment for Nick like she and her husband have done. She did not give examples of what father needs to do to show he is ready. Mrs. Medina does not think Nick should leave her custody. She did feel Nick would be impacted by not being with his brother Kaleb.

By all accounts, Nick has done well in his placement with the Medinas. We note that while there, he has not lived with Mason, who has much more severe special needs. Nick also has not been shuffled between households, or been in chaotic family situations. Nick and his brother Kaleb have been the sole focus of the Medinas. Nick is in a regular educational placement and he no longer has an I.E.P. Nick can become focused and intense and break things when mad. Some issues have also subsided.

We believe father is aware of Nick's needs and that he can also provide a good home environment. Father is stable with adequate housing, job, and a good relationship with his girlfriend Ms. Gravino. The visits between father and Nick have gone well, and Nick appears comfortable with him and with Ms. Gravino. Father can meet Nick's educational and emotional needs. Father has shown a willingness to seek advice, and follow instruction from

counselors. He has attempted to correct past mistakes and behavior. While there is an obvious bond between Nick and the Medinas, having lived there for three and one-half (3 1/2) years, there is also a bond that is being formed with father.

Although Nick would miss Kaleb if he moved to father's custody, father appears capable and willing to maintain contact with Kaleb and the Medinas. The Medinas and Talleys had already arranged visits in July and August 2013 between themselves and the children in their care. This can be continued in the future. Nick would also be close to Mason and his three other sisters if living with father. He would also be close to father's family, mother and maternal grandmother, with whom he could regularly visit.

Finally, Nick would have a parental presence that will be important, particularly as he gets older. That is riot to say the Medinas have not or could not continue to provide a parental presence in Nick's life. In fact, they have gone above and beyond what can be expected, even of extended family, in caring for Nick when it was most certainly necessary. However, as Nick gets older, it will be important that he have parents involved in his life who are ready, willing and able to provide for his needs. Father is ready, willing and able to provide at this time. In reviewing all factors in this matter, we find father is able to assume the obligations of primary physical custody of Nick.

We find that a gradual transition of Nick from living with the Medinas to living with father is necessary. The parties testified that the Talleys are visiting Nick in Texas for a week in August 2013. We believe father should also

have at least a full week of unsupervised custody of Nick in August before school starts. We will leave the actual date open to be worked out between the parties, but we will order the time be as father chooses to exercise, either in Texas, or at his house in New Jersey, or on a vacation, but at father's expense for transportation. We believe Nick should start and complete fall semester of school in Texas in order to allow for more visits with father, and time for the parties to arrange school withdrawal and placement, and, to prepare Nick for the transition. Father shall receive additional periods of custody throughout the fall. Physical custody shall be with father following the Thanksgiving break for Nick from school.

The attached order shall be made a part of this decision.

## ORDER

And now, this 6th day of August, 2013, following a full custody trial before the court wherein father, Richard Bongo was present represented by Attorney Brett Riegel, mother, Sarah Austin was present, one of the appointed guardians, Ann Marie Medina who has physical custody of Nicholas, age 10, was present, and represented by Attorney Joshua Goldberg, and one of the appointed guardians, Claudette Austin-Talley, who has physical custody of Mason, age 9, was present, and also represented by Attorney Joshua Goldberg, it is the order of this court, with respect to the minor children, Nicholas, born March 19, 2003, and Mason, born June 29, 2004;

## 1. LEGAL CUSTODY

Mr. and Mrs. Medina, guardians of Nicholas, and Mr. and Mrs. Talley, guardians of Mason, shall have legal

custody of the respective children. As of Thanksgiving, 2013, Richard Bongo shall have sole legal custody of Nicholas.

For purposes of this order "Legal Custody" shall mean the legal right to make major decisions affecting the best interests of the children, including but not limited to medical, religious and educational decisions.

(a) Respective legal guardians for the minor child shall have the duty to notify mother and father of any event or activity that could reasonably expected to be a significant concern to the mother, father, or to the child;

(b) Respective legal guardians for the minor child shall have the right to make any emergency decisions for the benefit of the minor child without consulting mother or father in advance. However, respective legal guardians for the minor child shall inform mother and father of the emergency and consult with her/him as soon as possible. Day to day decisions of a routine nature shall be the responsibility of the respective legal guardians for the minor child;

(c) Respective legal guardians for the minor child shall share complete and full information with mother and father from any doctor, hospital, dentist, or other authority, and each parent shall have copies of any reports given to the respective legal guardians for the minor child.

(d) Respective legal guardians for the minor child agree not to impair the parties' right to shared physical custody or supervised physical custody of the child. The parties agree to give support to each other in the role as parent, and take into account the consensus of the other for the

physical and emotional well being of the child with the recognition that their lifestyles may be different.

(e) It shall be the obligation of the respective legal guardians for the minor children to make the child available to mother and father in accordance with the following schedule and to encourage her/him to participate in the plan hereby set forth.

(f) Respective legal guardians for the minor child and mother and father shall communicate with one another concerning any parenting issues requiring consultation and agreement regarding a proposed modification of the custody schedule which may, from time to time, be necessary depending upon the needs of the child and the employment schedules of all the parties.

(g) The Talleys shall notify father in a reasonable amount of time beforehand, of all of Mason's activities and the dates, times and locations of such activities.

(h) The Talleys shall notify father in advance of all I.E.P. meetings, I.E.P. meeting results, and shall advise of their plans regarding requests to be made at I.E.P. meetings. The Talleys shall make all decisions for Mason's I.E.P., but shall do so only after consultation with father, and father shall respect the decision of the Talleys, even if he disagrees. The parties shall engage in a meaningful communication regarding the educational needs, goals and plans for Mason prior to a final decision being made.

## 2. SHARED PHYSICAL CUSTODY

Appointed guardians, Ann Marie Medina and Jesse Medina, her husband, shall have primary physical custody of the minor child, Nicholas, and appointed guardians,

Richard Talley and Claudette Austin-Talley, his wife shall have physical custody of Mason, under and subject to mother's periods of partial physical custody of both children and father's partial physical custody of the minor child, Nicholas and supervised partial physical custody of the minor child, Mason, as follows:

(a) With regard to mother, she shall have partial physical custody of Nicholas when she is available to travel to the state of Texas or such other place as designated by Mr. and Mrs. Medina for the days and times that can be agreed upon by the parties and while Nicholas is in the physical custody of the Medinas.

(b) Mother shall have partial physical custody of the minor child, Mason at least three days per month, the days and times to be agreed upon by the parties, and which may include the presence of Mr. and Mrs. Talley during these custody sessions.

(c) With regard to Nicholas, father shall communicate with him either by telephone or Skype on the internet computer of Mr. and Mrs. Medina. These Skype sessions shall be at least eight (8) times per month for a period of not more than one hour per session, four (4) of which shall be on Wednesday between 6:00 p.m. and 8:00 p.m. central time, and the remaining four (4) sessions may be on weekend days as agreed upon by the parties. Father shall also have partial physical custody with Nicholas when he travels to the state of Texas provided he notifies Mr. and Mrs. Medina at least fifteen (15) days prior to the time when he will be exercising his rights, and agreed upon by Mr. and Mrs. Medina, the permission for which shall not be unreasonably withheld. This partial physical

custody of Nicholas may occur at the home of Mr. and Mrs. Medina, and any other place in close proximity to the Medina residence which may also include overnight stays with father at a local motel. However, it shall be the responsibility and obligation of father to notify either Mr. or Mrs. Medina of the times and places where he will be exercising his partial physical custody rights with Nicholas, and allow Mr. and Mrs. Medina to have personal contact with Nicholas every day that father is exercising his rights.

Father shall also have one (1) full week (7 days) of uninterrupted physical custody of Nick during August 2013, either in Texas, or at his home in New Jersey, or on vacation somewhere, but all at his expense. This week shall not interfere with the week already planned for a vacation with the Medinas and the Talleys in Texas.

(d) Father may have up to two separate periods of physical custody, either in Texas, or at his house in New Jersey, any weekend after the start of school, provided all travel cost is at father's expense. The weekend is defined as 6:00 p.m. the last day of school until 8:00 p.m. the day before school resumes.

(e) Starting with the first day of Thanksgiving vacation from school in 2013, father shall have primary physical custody of Nicholas. At that time, mother shall be entitled to periods of partial physical custody of Nicholas to be exercised at maternal grandparents (Talleys) at least one weekend day every other week from 9:00 a.m. to 5:00 p.m., or as the parties can agree is best for Nicholas and Mason. The maternal grandparents and mother shall also be permitted any other dates and times as can be agreed

with father. The maternal grandparents and mother shall also be entitled to two (2) non-consecutive one week periods of physical custody to be taken together during Nicholas' summer vacation, with thirty (30) days advance notice to father. Such period of custody shall take place under the supervision of the maternal grandparents.

The Medinas shall have periods of partial physical custody as can be agreed with father, and they shall also be entitled to at least one full week of uninterrupted physical custody of Nicholas during his summer vacation, to be exercised in Texas or on a vacation. The Medinas shall give ninety (90) days advance notice to father of the date they plan to exercise this custody period.

(f) With respect to Mason, father may have contact with the child during the time that the child is receiving counseling sessions with Dara Duryea, LCSW at her offices located at 225 RT 10 East, Suite 201, Succasunna, New Jersey 07876, telephone number (973) 519-1647. Father shall continue to attend counseling sessions with the child in the presence of Ms. Duryea for a time period determined by her, but not less than once per month, in an effort to continue the reconciliation process between father and the child who experiences severe learning disabilities. Further, Father shall also have supervised partial physical custody with the child at the Talleys and supervised by Mrs. Talley when she is available. These visits shall occur at least once per week. Father shall also have community visits (i.e. at the park, playground, McDonald's, etc.) with Mason, supervised by Mrs. Talley at least once every other week for a minimum of one hour. This shall be in addition to the one time per week minimum visits at the Talley residence. Father shall not remove the child from the care

and custody of Mrs. Talley at anytime whatsoever when he is exercising his supervised partial physical custody rights with Mason, until further order of court.

## 3. HOLIDAYS

The Talleys, mother and father shall share physical custody on holidays as they can agree. This shall include Easter, Thanksgiving, Christmas Eve and Christmas, New Year's day, the children's birthdays, Mother's Day and Father's Day.

## 4. SPECIAL PROVISION

In the event that Mr. or Mrs. Medina travel to the state of New Jersey during the Easter, Thanksgiving, or Christmas holiday season, or any other federal holiday, father shall make arrangements with them to have partial physical custody with Nicholas for the days and times to be agreed upon by the parties.

## 5. PARENT TRAINING

Father shall continue to undergo parent training specific to autism spectrum disorders of children with Dr. Randy Bressler whose office is located at 68 Essex St., Suite 1A, Millburn, NJ 07041, who specializes in this type of counseling. Such counseling sessions shall continue at least twice per month for an additional three month period, the costs of which shall be the sole responsibility of father. This counselor shall submit a report to the court and for review by the conciliator specifying the type of training the counselor has presented to father, and the results of such training before any further order is entered concerning father's visits with Mason.

## 6. NOTICE: CHANGE OF RESIDENCE OR RELOCATION

Before a party may relocate the children or change the residence of the children in a manner which significantly impairs the ability of other individuals with custody rights to the children to exercise those rights, the party must comply with the requirements and obligations of Pennsylvania's Custody Law set forth in 23 Pa. C.S.A. 5337.